# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **CHARLES FREELAND,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:19-cv-00199-TES** |
| **HR SYNERGIES LLC,[1] and NORTH GEORGIA TURF, INC., a/k/a NG TURF, INC.,** | |
| *Defendants.* | |

---

## ORDER GRANTING DEFENDANT
## NORTH GEORGIA TURF, INC.'S, MOTION FOR SUMMARY JUDGMENT

---

Based on the protections provided by federal anti-discrimination laws, Plaintiff

Charles Freeland brings this action against his former employer, North Georgia Turf,

Inc. ("NG Turf"), to remedy alleged employment discrimination and retaliation on the

basis of his race and his engagement in protected activity. *See* 42 U.S.C. §§ 1981, 2000e *et*

*seq.*; [Doc. 1, ¶ 1].[2] Now, with the benefit of discovery, NG Turf seeks summary

judgment against Freeland. *See* [Doc. 27]. Having reviewed the evidence presented by

---

[1] Plaintiff Charles Freeland voluntarily dismissed Defendant HR Synergies LLC, on March 11, 2019. [Doc. 4].

[2] Freeland also claimed that NG Turf violated the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*; however, the parties stipulated and agreed to the dismissal of those claims. [Doc. 1, ¶¶ 1, 84-89]; [Doc. 18].

the parties and their respective arguments, NG Turf is entitled to summary judgment

on Freeland's discrimination and retaliation claims as a matter of law.

## FACTUAL BACKGROUND

NG Turf is a company owned by Aaron and Maryanne McWhorter that grows

sod on several farming locations throughout Georgia. [Doc. 39-4, Howard Depo., p.

27:22–23]; [Doc. 39-1, ¶¶ 1–2]. Aaron, as the chief executive officer, sits at the top of the

company hierarchy, and his son, Mark McWhorter, serves as the president of NG Turf.

[*Id.* at p. 30:12–25]; [Doc. 28, McWhorter Decl., ¶ 4]. Under Mark, Judd Howard works

as the vice president of business operations, and Mark's sister, Merett Alexander, serves

as the vice president of marketing and sales. [Doc. 39-4, Howard Depo., p. 31:1–4]. All

employees involved in business operations report to Judd and Merett. [*Id.* at p. 31:5–9].

Each of NG Turf's farms has its own chain of command. [Doc. 39-1, ¶ 5]. At the

bottom, a crew of farm workers performs three farming operations: mowing,

harvesting, and special projects and land preparation. [*Id.*]; [Doc. 39-2, Howard Depo.,

p. 33:9–11]. Each farming operation has a team lead, but each crew, as a whole, reports

to its respective farm manager. [Doc. 39-2, Howard Depo., p. 32:3–5]; [Doc. 30,

McWhorter Depo., p. 11:5–10]. Then, each farm manager reports to either Mark or Judd

depending on the topic. [Doc. 39-2, Howard Depo., p. 31:11–23]. If the topic relates to

production issues like growing the sod, a farm manager reports to Mark. [*Id.*]. If the

issue relates to hiring an employee or an invoice for a purchase, then a farm manager

reports to Judd as the overseer of accounts payable and receivable. [*Id.*]. So, where does Freeland fit into this hierarchy and how did his discrimination and retaliation claims come about? As with any story, it's best to start at the beginning.

Mark has known Freeland since Freeland was about four or five years old. [Doc. 30, McWhorter Depo., p. 22:13–14]. Through his life, Freeland regarded Mark as a father figure, perhaps because of Mark's willingness to always be there for him and to give him advice. [Doc. 31, Freeland Depo., pp. 10:25—11:1; 13:21–22]. At just 12 years old, Freeland started working at NG Turf for a summer job as an equipment operator— mainly cutting grass. [Doc. 39-1, ¶ 15]; [Doc. 31, Freeland Depo., pp. 18:19—19:2]. Then, when he was 16, he started working full-time, and for the next 20 years, Freeland worked on and off for NG Turf at least seven times. [Doc. 39-1, ¶¶ 16, 18]. Over the course of this 20-year history, whenever Freeland had "another or better opportunity elsewhere[,]" he would resign on good terms with the understanding that he could always return. [Doc. 39-20, Freeland Decl., ¶ 2]; [Doc. 30, McWhorter Depo., p. 130:4– 10]. If work was available at NG Turf, Mark always hired him back.[3] [Doc. 39-20, Freeland Decl., ¶ 3]. Within two months of Freeland's last return to NG Turf in early 2017, he was the team lead for his crew, under his farm manager, Tim Chastain. [Doc.

---

[3] Freeland never discussed employment opportunities with Aaron, only Mark. If Freeland needed a job, Freeland would simply "go talk to [Mark]," and Mark would give him a job depending on whether NG Turf needed the help. *See* [Doc. 31, Freeland Depo., p. 26:2–3 (noting that Freeland "never called" Aaron "or put in an application to go work for him")].

39-1, ¶¶ 5, 27]; [Doc. 31, Freeland Depo., pp. 180:12—182:2]; [Doc. 30, McWhorter Depo., p. 138:10–11].

Sometime in 2017, Freeland expressed concerns to Mark that Tim was "not properly updating and signing off his timecard" for the hours and work he had completed.[4] [Doc. 39-1, ¶ 30]; [Doc. 31, Freeland Depo., pp. 78:12–15; 82:2–19]. A large portion of Freeland's discrimination claims center around his allegations that he, as a black man, wasn't getting paid right. However, to detail the minutia of NG Turf's innerworkings when it comes to calculating how much an employee earns would be unnecessary given the parties' stipulation and agreement to dismiss Freeland's claims under the Fair Labor Standards Act ("FLSA"). *See* n.2, *supra*; [Doc. 39-1, ¶ 13]. Nevertheless, Freeland's contention that his farm managers didn't sign off on his time "because of [his] race" backdoors certain facts related to the race discrimination issues before the Court. [Doc. 31, Freeland Depo., p. 117:6–8].

On one occasion, while Freeland was visiting the home of another farm worker, that farm worker told Freeland "that none of the managers [at NG Turf] want any black people here[.]" [*Id.* at pp. 59:20—60:7]. At that time, Tim was Freeland's manager, but in December 2017, NG Turf terminated Tim, and Chris Carter, who was already on NG

---

[4] Most of the time, Freeland filled out his own timecard, but there were instances—say, if Freeland was working off-site—where he might have to ask his farm manager to complete or update his timecard. [Doc. 31, Freeland Depo., p. 81:7–19]. Regardless of whether Freeland or his farm manager filled out his timecard, his farm manager still had to approve it before sending it to payroll. [*Id.* at p. 82:2–7 (indicating that Freeland "can't sign off on [his] own [timecard]")]; [Doc. 39-1, ¶ 31].

Turf's staff, received a promotion and became Freeland's farm manager.[5] [Doc. 39-4, Howard Depo., pp. 67:3—68:9]; [Doc. 30, McWhorter Depo., p. 60:1–7]. On another occasion, during April 2018, Mark issued written discipline to Chris for using a racial slur—the N-word. [Doc. 39-1, ¶ 40]; [Doc. 31, Freeland Depo., p. 198:16]. While Freeland didn't actually hear Chris use the slur, "it was brought to [his] attention that it was said." [Doc. 31, Freeland Depo., pp. 198:16—199:1].

On the morning of August 20, 2018, Freeland wasn't scheduled to work, but he drove to the farm to drop off his fellow crew members. [*Id.* at p. 133:9–11]. While at the farm, Freeland approached Chris to discuss pay-related concerns from a black employee on Chris's crew and those of Freeland's all-black crew. [Doc. 39-1, ¶¶ 43–44]; *see also* [Doc. 31, Freeland Depo., pp. 130:22—132:2]. The events from that morning and the events that unfolded the following week led to Freeland filing this lawsuit. During Chris and Freeland's conversation, Chris did not act hostile or aggressive in any way—he just sat there without speaking. [Doc. 39-1, ¶ 43]. Freeland left after he voiced the pay-related issues to Chris. [Doc. 31, Freeland Depo., p. 133:24–25]. Unfortunately, the exchange between Freeland and Chris wasn't this uneventful.

While the parties may disagree about certain specifics of the exchange (i.e., whether Freeland told Chris that "[he] and none of his people were going to work until

---

[5] There wasn't a particular "incident that led to Mark firing Tim[,]" instead Tim's separation stemmed from his inability to run a farm. [Doc. 39-4, Howard Depo., pp. 67:13—68:4].

they got their paychecks fixed[]"), the evidence easily shows that Freeland and Chris's conversation didn't end well. [Doc. 30, McWhorter Depo., p. 111:13–17] *in connection with* [Doc. 31, Freeland Depo., p. 147:7–11]. In the end though, according to NG Turf, Freeland "didn't get the answer he wanted," so he threw his company-provided vehicle in reverse and broke its gearshift. [Doc. 39-4, Howard Depo., pp. 37:20—38:6 (indicating that Freeland had a company vehicle because of "his close relationship with Mark"); 119:13–24; 151:10—153:6]; [Doc. 30, McWhorter Depo., p. 25:17–18 ("There's paperwork where we bought parts to fix that particular truck.")].

Chris recounted his version of what went down that morning to Mark. [Doc. 30, McWhorter Depo., p. 111:13–24]. Then, Mark called Freeland to get his side of the story. [*Id.* at pp. 111:25—112:2]. Whereas Chris told Mark that Freeland had "go[ne] off in the shop yard," Freeland described his and Chris's exchange as nothing short of cordial. [*Id.* at p. 112:15–17]; [Doc. 31, Freeland Depo., p. 149:9–12 (Freeland's explanation that he was "totally respectful to [Chris]")]. Then, Freeland testified that Mark "blew up" on him—told him that he was "sick of [his] attitude," his inability to "get along with anybody," and that he "was acting crazy." [Doc. 31, Freeland Depo., p. 165:4–8]. "Ultimately[,]" according to Mark, he and Freeland "basically hung up on each other" when Mark said, "[S]tay gone." [Doc. 30, McWhorter Depo., p. 113:10–12]; [Doc. 31, Freeland Depo, p. 165:11–13].

Uncertain as to what "stay gone" meant, Freeland texted Mark and said, "[S]tay

gone?" [Doc. 31, Freeland Depo., p. 165:13–14]. Mark replied, "Yeah. Unless [you] can work with these people around here without conflict[,] including Chris[,] then yes. Don't come back over here. I deal with [your] attitude with other people way too much. [You] would already be fired if I wasn't here." [Doc. 31-1, pp. 84–85]. Instead of terminating Freeland based on Chris's account that Freeland "blew up on him," Mark suspended Freeland for a week. [Doc. 31, Freeland Depo., p. 135:14–18]; [Doc. 39-1, ¶ 56 ("[Freeland] was suspended because of what [Chris] told [Mark] regarding the incident on August 20, 2018.")]. According to Mark, Freeland had a bit of a "reputation for being difficult to work with." [Doc. 28, McWhorter Decl., ¶ 9]. Mark even knew that Freeland wasn't "the easiest to get along with," but he "never had this problem personally because [Freeland] thought of [Mark] as a father figure." [*Id.* at ¶ 21].

During Freeland's suspension, two major things happened. First, the day after Mark suspended Freeland—August 21, 2018—Freeland called the Equal Employment Opportunity Commission ("EEOC") to complain "about the pay discrepancy." [Doc. 31, Freeland Depo., pp. 137:14—139:15]. Second, Mark took it upon himself to investigate what happened that morning by speaking to other employees. [Doc. 28, McWhorter Decl., ¶ 22]. Through this investigation, Mark learned "how toxic [Freeland's] presence was," and an employee (Jay Alexander "Jawan" Boswell), "informed [Mark] that [Freeland] discussed suing [NG Turf]." [*Id.* at ¶¶ 22–23]; [Doc. 31, p. 80]. Now, candidly, there are specifics that must be discussed regarding exactly what Jawan said to Mark

during the investigation. To flush those specifics out here would complicate matters unnecessarily, so the Court details them later in this Order when analyzing Freeland's retaliation claims. At summary judgment, NG Turf takes the position that Freeland's potential lawsuit "played no role" in Mark's decision to terminate Freeland. [Doc. 27-2, ¶ 70]. Freeland, on the other hand, argues that when Mark laid him off via text message the night before he was supposed to return to work, Mark retaliated against him because of what he learned from Jawan.[6] [Doc. 39-1, ¶ 69]; [Doc. 31-1, p. 91].

Very clearly, Freeland testified at his deposition that he didn't think Mark terminated him because of his race. [Doc. 31, Freeland Depo., p. 142:21–23]. This is a significant statement when assessing his race-based claims, and all but streamlines his case into one core issue—Freeland is suing NG Turf based on his belief that "Mark terminated [him] because [he] was engaging in protected activity." [*Id.* at p. 142:23–24].

## DISCUSSION

### A.   Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving

---

[6] Freeland was officially terminated on August 27, 2018. [Doc. 39-1, ¶ 69].

party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002)

(quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991));

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears

the initial responsibility of informing the court of the basis for its motion." *Four Parcels*,

941 F.2d at 1437. The movant may cite to particular parts of materials in the record,

including, "'the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any,' which it believes demonstrate the absence of a

genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)); Fed. R. Civ. P. 56(c)(1)(A).[7] "When the nonmoving party has the burden of proof

at trial, the moving party is not required to 'support its motion with affidavits or other

similar material negating the opponent's claim[]' in order to discharge this 'initial

responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323).

Rather, "the moving party simply may show—that is, point out to the district court—

that there is an absence of evidence to support the nonmoving party's case." *Id.*

(quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide

"affirmative evidence demonstrating that the nonmoving party will be unable to prove

its case at trial." *Id.*

---

[7] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

**B.     Application of the Summary Judgment Standard to Freeland's Claims**

**1.     Termination Claims**

Title VII and § 1981 undoubtedly prohibit workplace discrimination on the basis of race. In disparate treatment cases like this one, a plaintiff can survive summary judgment through satisfying the well-known burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973), or by demonstrating a convincing mosaic of circumstantial evidence that creates a triable issue concerning an employer's discriminatory intent.[8] *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (citation omitted); *see also Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (prima facie case for disparate treatment in race

---

[8] The underlying facts for Freeland's Title VII and § 1981 claims are the same; thus, "[t]he same analysis— and in particular, the *McDonnell Douglas* burden-shifting framework" would apply to both. *Lewis I*, 918 F.3d at 1220 n.5 (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). However, as NG Turf iterates in its summary judgment motion, "the Supreme Court has recently clarified the causation standard under § 1981." [Doc. 27-1, p. 6]. Applying the Supreme Court's decision in *Comcast Corp. v. National Association of African American-Owned Media*, Freeland "faces a more stringent hurdle for relief under § 1981, and [he] must prove his allegations utilizing the 'but for' causation standard." 140 S.Ct. 1009, 1019 (2020); [Doc. 27-1, p. 6].

discrimination case); *McPhie v. Yeager*, 819 F. App'x 696, 699 (11th Cir. 2020) (citing

*Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012)) (convincing

mosaic).

This, however, is a rare race-based employment discrimination case. Often, when

initiating a lawsuit, plaintiffs plead allegations in their complaint, and as the case

progresses, the evidence reveals certain things that may or may not disprove those

initial allegations. Freeland's Complaint has all of the usual claims for relief that

accompany workplace race discrimination cases, but the easiest way to handle his

claims is to go through what this case is not. *See, e.g.*, [Doc. 1, pp. 12–20]. By Freeland's

own unequivocal admission, he does not allege that his employer fired him because of

his race.

> Q:    Do you think Mark McWhorter terminated you because of your
>        race?
> A:    No. Mark McWhorter terminated me because I was engaging in
>        protected activity. Mark McWhorter is not a racist.

[Doc. 31, Freeland Depo., p. 141:21–25].

Even though Freeland acknowledged NG Turf's arguments under *McDonnell*

*Douglas*, he never even attempts to identify a similarly situated comparator. *See generally*

*Lewis v. City of Union City*, 918 F.3d 1213, (11th Cir. 2020) (en banc) ("*Lewis I*"). Instead,

Freeland tries to present a "convincing mosaic" to get his race discrimination claims to a

jury. [Doc. 39, p. 5]. But here too, Freeland detrimentally curtails his argument. Freeland

lays out what must be shown to construct a convincing mosaic, but aside from the

short, conclusory statement that he "can undoubtedly present evidence [that] raises a reasonable inference of intentional discrimination[,]" the actual construction of his mosaic leaves much to be desired. [Doc. 39, p. 4]; *see also* n.13, *infra*. The majority of Freeland's argument focuses on his termination as it relates to his engagement in protected activity, not his termination as a result of race-based discrimination. What Freeland does argue, however, with respect to his belief that race had something to do with his termination, is that a subordinate supervisor harbored racial bias against him. Appellate courts have dubbed this type of argument the "cat's paw" theory of liability.

In the Eleventh Circuit, this theory can be used to establish liability if Freeland "shows that the decisionmaker *followed a biased recommendation* without independently investigating the complaint against the employee." *Bruno v. Greene Cnty. Schs.*, 801 F. App'x 681, 685 n.5 (11th Cir. 2020) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)) (alteration adopted) (emphasis added). Under the theory, if the decision-making party didn't conduct an independent investigation and still took an adverse employment action against the plaintiff, he has essentially rubber-stamped the bias recommendation, and "the recommender's discriminatory animus is imputed to the decisionmaker." *Duncan v. Alabama*, 734 F. App'x 637, 639 (11th Cir. 2013) (citing *Stimpson*, 186 F.3d at 1331–32). "However, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the identified employee misconduct, was an actual cause of the adverse employment action." *Id.*

13

Essentially, Freeland argues that, Chris, his farm manager, harbored racially-discriminatory motives that were imputed to NG Turf through its decisionmaker, Mark. With the burden on Freeland, he has to prove that Chris's racial animus caused his termination.[9] *Bruno*, 801 F. App'x at 685 n.5 (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1248 (11th Cir. 1998)). Here, Freeland offers no evidence that Chris ever recommended to Mark that he should fire Freeland. Certainly, this critical deficiency prohibits any possibility of liability through a "cat's paw" theory, but Freeland attempts to escape this fatal flaw by focusing on Chris's admitted use of the N-word. [Doc. 30, McWhorter Depo., p. 57:18–19]; [Doc. 39-4, Howard Depo., p. 127:2–15]. However, Freeland's attempt to hold NG Turf responsible for race discrimination because one of its managers used the N-word, fails.

Despite his argument in briefing that Chris used the N-word "to refer to black employees on multiple occasions," Freeland could only recall two occasions, both occurring in 2018.[10] [Doc. 39, p. 16]; *see also* [Doc. 31, Freeland Depo., p. 62:20–24 (Freeland's testimony that Chris said that one of the crew workers "was the sorriest [N-word] they ever brought down here[]")]; [Doc. 30, McWhorter Depo., p. 58:21–23 (Mark's testimony that he "think[s] [Chris's] phrase was 'If them [N-words] would get

---

[9] Under Title VII, Chris's perceived discriminatory animus must be a "motivating factor," and under § 1981, Freeland must show that "but-for" Chris's animus he would not have been fired. *See* n.8, *supra*.

[10] The Court gives Freeland the benefit of the doubt that "multiple occasions" could technically mean two.

back to work out there in the field' or that they need to get to work in the field[]")]. In a true "cat's paw" situation, "the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers." *Llampallas*, 163 F.3d at 1248 (citations omitted). Stated differently, "the harasser is the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the harasser's discriminatory animus." *Id.*

No one would argue that Freeland believes that Chris's perceived racial animus was the cause of his pay-related issues, but Freeland is taking it one step further. [Doc. 31, Freeland Depo., p. 119:13–19]. Freeland argues that Chris's "conduct"—his "false account" to Mark that Freeland "blew up" on him—was a "motivating factor" in his termination such that Mark was the conduit through which Chris's perceived racial bias passed. [Doc. 39, p. 16]. The Eleventh Circuit Court of Appeals, however, has expressly rejected application of the "cat's paw" theory "[w]hen the employer makes an effort to determine the employee's side of the story before making a tangible employment decision affecting that employee[.]" *Llampallas*, 163 F.3d at 1250. Here, Mark did just that.

The record evidence clearly shows that Mark called Freeland to get "his side of the story." *Id.*; [Doc. 31, Freeland Depo., p. 164:15] In short, Mark didn't take Chris at his word, he did his own independent investigation. Mark called Freeland. Mark and Freeland exchanged text messages. And, importantly, Mark spoke with other NG Turf

employees about what happened that morning. However, as for Mark's investigation, Freeland argues that it is "unworthy of credence" and that "a discriminatory reason more likely motivated" Mark. [Doc. 39, p. 18]. According to Freeland, "[t]he record contains abundant evidence from which a reasonable ju[ry] could find the justifications [NG Turf] now alleges for [his] termination 'not believable.'" [*Id.* at p. 17 (quoting *Howard v. BP Oil, Co.*, 32 F.3d 520, 526 (11th Cir. 1994))]. However, Freeland's brief goes long on conclusion and falls well short on analysis.

First, Freeland contends that NG Turf "cannot produce a single document or write-up" to support its contention that Freeland "exhibit[ed] a bad attitude." [Doc. 39, p. 17]. Second, Freeland takes issue with the fact that NG Turf has nothing to show for Mark's investigation—"not a scrap of paper, email, text message, schedule, or otherwise." [*Id.* at p. 18]. Without any documentation, Freeland urges the Court to find that NG Turf's proffered nondiscriminatory reason—Freeland's bad attitude—is pretext, masking what he believes to the true reason for his disparate treatment—Chris's imputed racial bias.

Freeland's own argument in briefing, however, clearly belies both of these contentions, and they lack merit. While there may not be "a scrap of paper" in NG Turf's records detailing Freeland's disciplinary history or Mark's discoveries, the record evidence (discussed more fully below) shows exactly how Mark handled his

investigation to uncover what happened that morning.[11] *See, e.g.*, [Doc. 30 McWhorter Depo., pp. 111:25—114:5; 130:24—131:14]. If Chris did, in fact, harbor racial animus, Freeland undoubtedly admits that "[Mark] made the decision to terminate . . . Freeland *by himself*, without consulting other upper management (the usual procedure)." [Doc. 39, p. 18] (emphasis added). If Freeland admits that Mark made the decision "by himself" to terminate him, how could he plausibly argue that Chris had anything to do with his termination? He can't. Mark didn't blindly accept Chris's version of what happened that morning, he investigated and got to the bottom of it. Moreover, to the extent Freeland suggests that Mark should not have acted "by himself," but should have consulted with Chris (as a member of "upper management"), such a suggestion works against the very essence of imputing racial bias through a "cat's paw." To say that Mark had to consult with Chris about whether to terminate Freeland would mean that Mark needed to seek out a racially-biased suggestion. And, given NG Turf's hierarchy and the fact that Mark was always the one who hired Freeland, it is difficult to imagine with whom Mark would need to consult before deciding to fire him. *See* n.3, *supra*. If this isn't enough to show the baselessness of Freeland's "cat's paw" theory, perhaps, most significantly, the father-son-like relationship between Freeland and Mark would be. Their unique and long-standing relationship undercuts any notion that Chris

---

[11] Mark explicitly testified to NG Turf's lack of written records detailing Freeland's disciplinary history. Since Mark "treated [Freeland] like he was almost part of the family," . . . Mark "felt like . . . discipline to [Freeland] could just be a verbal conversation." [Doc. 30, McWhorter Depo., p. 130:4–16].

had any real sway over Mark when it came to deciding whether Freeland worked at NG Turf. Simply put, Freeland's attempt to hold TG Turf liable through a "cat's paw" theory fails because (1) there is no evidence that Chris ever hinted to Mark that he should terminate Freeland and (2) Mark's refusal to blindly accept Chris's account and, instead, conduct his own investigation render's Mark's "decision free of the taint of [the] biased subordinate employee." *Anterio v. City of High Springs*, 762 F. App'x 891, 899 (11th Cir. 2019) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270–71 (11th Cir. 2001)).

Finally, NG Turf also argued that summary judgment is appropriate for Freeland's disparate treatment claim under the usual path: the *McDonnell Douglas* burden-shifting framework. [Doc. 27-1, pp. 6–9]. NG Turf also put forth arguments that summary judgment is proper for Freeland's race-based hostile work environment claim. [*Id.* at pp. 15–18]. However, Freeland "offered no rebuttal" to these arguments. *See* [Doc. 43, p. 2 n.3]. Instead, Freeland, to no avail, focused on proving his case through a convincing mosaic of discrimination and a "cat's paw" theory of liability. [Doc. 39, pp. 5, 15–19]. To the extent Freeland thought he could defeat summary judgment on these claims through the allegations made in his Complaint [Doc. 1], he is incorrect. At this stage, Freeland must "formulate arguments" to demonstrate that summary judgment is

inappropriate to keep his claims alive.[12] *Resol. Tr. Corp. v. Dunmar*, 43 F.3d 587, 599 (11th Cir. 1995). Since Freeland solely banked his claims on "grounds alleged in" his Complaint and did not respond to NG Turf's arguments against certain claims, those "are deemed abandoned," and the Court **GRANTS** summary judgment to NG Turf on Freeland's discrimination claims.[13] *Id.* Thus, all that remains for the Court to consider is Freeland's claim that Mark fired him because he engaged in protected activity. [Doc. 31, Freeland Depo., p. 142:23–24].

### 2.    Retaliation Claims

A retaliation analysis begins with establishing the prima facie case.[14] Making a

---

[12] Even if it is improper to conclude that Freeland abandoned certain claims, namely his hostile work environment claim, summary judgment would still be appropriate. *McCann v. Tillman* tells us that when an employee hears of a racial epithet, but that epithet is not directed at or spoken to that employee, there is insufficient evidence to support a hostile work environment claim. 526 F.3d 1370, 1379 (11th Cir. 2008). Here, the evidence clearly shows that Freeland didn't actually hear Chris say the N-word. [Doc. 31, Freeland Depo., pp. 198:16—199:1]. Rather, "it was brought to [Freeland's] attention that it was said." [*Id.*].

[13] The Court pauses to note that NG Turf's argument that Freeland abandoned his race discrimination claim because he failed to put forth a valid comparator isn't exactly proper. Freeland is correct that he doesn't necessarily have to prove his race-based employment discrimination claim through the *McDonnell Douglas* framework. As Freeland states, he is free to present his case through a convincing mosaic as well. [Doc. 39, p. 5]. Fact of the matter is, however, Freeland only lays out the law for how to demonstrate a convincing mosaic and makes a conclusory statement that the evidence of this case is enough to make one. [*Id.*]. Despite this, Freeland never shows the Court *how* the evidence so demonstrates, and the Court will not piece his mosaic tiles together for him. *See Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011). It is not the district court's job, "especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the [record]." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1149 (11th Cir. 2017) (citation omitted).

[14] Although they are cognizable under both Title VII and § 1981, retaliation claims are analyzed under Title VII's framework. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (citations omitted).

prima facie case for retaliation requires a plaintiff to show that he engaged in statutorily protected activity and suffered an adverse action that was causally related to the protected activity. *Gogel v. Kia Motors Mfg. Grp. of Ga., Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (citations omitted). Once established, the prima facie case "creates a 'presumption that the adverse action was the product of an intent to retaliate.'" *Id.* at 1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). Then, the burden shifts to the defendant "to rebut the presumption [of retaliation] by articulating a legitimate, [nonretaliatory] reason for the employment action." *Id.* "If the [defendant] produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the 'proffered reason was merely . . . pretext," masking a retaliatory action. *Id.*

Let's start with the prima facie case—whether Freeland can show that "he engaged in statutorily protected activity, [that] he suffered a materially adverse action, and [that] there was some causal relation between th[ose] two events." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). First question: can Freeland show that he engaged in statutorily protected activity?

"Title VII 'recognizes two forms of protected conduct.'" *McWhorter v. Nucor Steel Birmingham Inc.*, 304 F. Supp. 3d 1185, 1193 (N.D. Ala. 2018) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999)). Via its opposition clause, Title VII

20

protects an employee from retaliation if he has opposed any practice made an unlawful employment practice by Title VII. 42 U.S.C. § 2000e-3(a). Similarly, under the participation clause, Title VII protects an employee from retaliation if "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.*

In this case, no one disputes that Freeland's reaching out to the EEOC was protected activity and that Freeland's termination was an adverse employment action. [Doc. 31, Freeland Depo., p. 179:1–11 (showing that Freeland first "contacted [the EEOC] by . . . fil[ing] a complaint to the [EEOC's] [web]site")]; [Doc. 27-1, p. 9 (NG Turf's concession that "going to the EEOC is 'protected activity' under the participation clause[]")]. Rather, NG Turf asserts that Freeland's prima facie case "suffers from a fatal flaw"—"[a] lack of causation between Freeland's [contact with] the EEOC and Mark's decision to terminate him." [Doc. 27-1, p. 9].

The "casual connection" element of the prima facie case serves to demonstrate that a plaintiff's protected activity and an employer's adverse employment action are "not wholly unrelated." *Gogel*, 967 F.3d at 1135–36 (quoting *Goldsmith*, 513 F.3d at 1277–78). And a portion of the causation analysis for a retaliation claim requires a court to consider whether the protected activity and the adverse employment action were close in time. *Higdon v. Jackson*, 393 F.3d 1211, 1220–21 (11th Cir. 2004). Here, temporal

proximity is not even remotely an issue. Freeland's contact with the EEOC and his termination were separated by a mere five days.

Unable to temporally pierce the causation element of Freeland's prima facia case, NG Turf asserts that Freeland cannot prove that his contact with the EEOC and his termination were casually related because Mark "had no knowledge of [the protected activity]." [Doc. 27-1, p. 9]. Factually speaking, the answer to this question—whether Freeland can demonstrate the requisite causal connection lies with what happened in the middle of Mark's investigation into the events from the morning of August 20, 2018. To briefly recap, Freeland approached Chris to voice pay-related concerns—the conversation that resulted in Freeland's suspension. The next day, Freeland contacted the EEOC. [Doc. 31, Freeland Depo., p. 139:12–15].

So, because NG Turf concedes that contacting the EEOC is protected activity, the issue before the Court becomes whether Freeland can show that Mark knew about it and fired him because of it. [Doc. 27-1, p. 9]. To support his claim that Mark terminated him "because [he] was engaging in protected activity[,]" Freeland provided the following deposition testimony. [Doc. 31, Freeland Depo., p. 142:23–24]. First, when asked (by NG Turf's attorney at his deposition) whether he "think[s]" his coworker, Jawan, "told Mark that [he] went to the EEOC[,]" Freeland responded that he "know[s] it." [*Id.* at p. 139:16–18]. Moments later, however, Freeland testified that, another coworker, Lonny Evans, told him that "Jawan . . . told Mark that [Freeland] was trying

to sue [him]." [*Id.* at pp. 139:24—140:7]; [Doc. 31, p. 80]. There are notable differences between these two statements. One version specifically mentions the EEOC (protected activity) while the other only shows that Jawan told Mark that Freeland was trying to sue him (not necessarily protected activity).

Mark, on the other hand, testified that no one, not even Jawan, "c[a]me to [him] and sa[id] that [Freeland] ha[s] been thinking about calling the EEOC or making [a] complaint with the EEOC" during Freeland's suspension. [Doc. 30, McWhorter Depo., pp. 140:15–22; 141:7–8]. Mark even went as far as confirm his account of what Jawan said to him. "Jawan . . . came to [Mark], and . . . basically t[old] [Mark] that [Freeland] may be looking to file a lawsuit against [him]," but according to Mark, "[Jawan] said nothing about the EEOC." [*Id.* at pp. 140:22—141:1]. Based on this, Mark testified that even though he "found out that [Freeland] was going to file a lawsuit against [NG Turf]" that knowledge was "[a]bsolutey not" the reason for Freeland's termination. [*Id.* at p. 197:22–24].

As the nonmovant, Freeland's evidence must be believed. *Anderson*, 477 U.S. at 255. However, what Freeland proffers is textbook hearsay. "[I]nadmissible hearsay cannot be considered on a motion for summary judgment" unless "the statement could be reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322–23 (11th Cir.1999)). "The most obvious way that hearsay testimony can be reduced to admissible form is to have

the hearsay declarant testify directly to the matter at trial." *Jones*, 683 F.3d at 1294

(citation omitted). At trial, Freeland could easily have Jawan tell the jury exactly what

he told Mark. Whether Jawan mentioned a general "lawsuit" or specifically mentioned

the EEOC is extremely material to the outcome of Freeland's retaliation claims. [Doc. 30,

McWhorter Depo., pp. 140:15—141:8]. Only mentioning the possibility of a "lawsuit"

could have been Jawan's attempt to tell Mark about a potential lawsuit strictly related

to Freeland's FLSA-related concerns as opposed to a lawsuit based on Freeland's

protected class. It could have been an attempt to tell Mark about a lawsuit that Freeland

wanted to bring against Mark, personally for something completely unrelated to

Freeland's employment at NG Turf. But, in light of the significance that accompanies a

specific mention of the EEOC, the Court will, for purposes of ruling on NG Turf's

summary judgment motion, give Freeland the benefit of all doubt and assume that

Jawan specifically mentioned the EEOC to Mark. And when drawing that reasonable

inference in Freeland's favor—that Mark was aware that Freeland engaged in protected

activity—it is clear that Freeland makes a prima facie case for retaliation. *Anderson*, 477

U.S. at 255. Thus, it can be *presumed* that Freeland's termination "was the product of

[Mark's] intent to retaliate." *Gogel*, 967 F.3d at 1135 (quoting *Bryant v. Jones*, 575 F.3d

1281, 1308 (11th Cir. 2009)). Now, the burden falls to NG Turf to rebut the presumption

that Mark intended to retaliate against Freeland. NG Turf's burden is one of production,

and it satisfies its burden if it can "articulat[e] a legitimate, [nonretaliatory] reason" for Mark's decision to terminate Freeland. *Id.*

Between the morning of Freeland's suspension (August 20, 2018) and his termination (August 26, 2018), Mark made sure to look into what happened, but, of course, Freeland (despite Mark's phone call and text messages to him) denies that Mark "conducted any sort of workplace 'investigation' [that] resulted in . . . Freeland's termination." [Doc. 39-1, ¶ 59]. By Freeland's account, the only things Mark learned during his investigation was Chris's "false report" that Freeland had "go[ne] off in the shop yard" and that Jawan warned Mark about Freeland's engagement in protected activity. [*Id.*]; [Doc. 30, McWhorter Depo., p. 112:15–17].

By Mark's account though, he learned much more. Mark states that during his investigation, he learned that Freeland "got into an altercation with Chris . . . where [Freeland] raised his voice and cursed at [Chris]." [Doc. 28, McWhorter Decl., ¶ 20]. "Several employees were present for the altercation and told [Mark] about it . . . ." [*Id.*]. "Following the incident," Mark also states that he learned that Freeland "damaged a work truck by breaking the shifter handle." [*Id.*]. In addition to what happened that morning, "[o]ther employees had a negative perception" of Freeland, and "they often informed [Mark] that he was difficult to work with and had a bad attitude." [*Id.* at ¶ 19]. In fact, Mark says that "[s]ome employees even left their job at NG Turf because of [Freeland's] bad attitude." [*Id.*]; [Doc. 30, McWhorter Depo., p. 33:9–12 (noting

complaints about Freeland were that he "would come to the field, start cussing at them, and, you know, he wasn't happy with what was going on and just come and start cussing at them[]")]. Importantly, Freeland never takes issue with what his coworkers told Mark. He never produces any discrediting evidence that Mark lied about his beliefs and that retaliation "was the real reason" for him getting fired. *See Gogel*, 967 F.3d at 1136; *see also Josendis*, 662 F.3d at 1315, *supra*. All he does is try to create a genuine issue of material fact via pretext that Mark's investigation is not supported by NG Turf's business records. [Doc. 39, p. 18].

Soon after the incident between Freeland and Chris, we know that Mark "spoke with" Freeland. [Doc. 28, McWhorter Decl., ¶ 21]; *see, e.g.*, [Doc. 31, Freeland Depo., pp. 164:15—165:13]. True, Mark hadn't himself experienced this side of Freeland, but, based on what he learned through his investigation and now *believed*, Mark felt that termination was necessary. *See Alvarez*, 610 F.3d 1253, 1266 (11th Cir. 2010); *Jones*, 683 F.3d at 1293–94, *supra*. To put it bluntly, after Mark "spoke with the other employees about the incident," Mark learned about—what he himself terms as—Freeland's "toxic . . . presence." [Doc. 28, McWhorter Decl., ¶ 22]. "In all [his] time working NG Turf, [Mark] can't recall any employee who has exhibited a bad attitude or a failure to get along with others that is comparable to [Freeland's]." [*Id.*]. Finally, "[i]n light of . . . feedback from other employees," Mark decided to fire Freeland because "the incident" on the morning of August 20, 2018, "was the straw that broke the camel's back." [*Id.* at

¶ 24]; *see also Alvarez*, 610 F.3d at 1270 ("Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint.").

Simply enough, NG Turf offers Freeland's "inability to get along with others and his bad attitude[]" as its legitimate, nonretaliatory reason for firing him. [Doc. 27-1, p. 12]. With such a reason produced, NG Turf has rebutted the presumption that Mark retaliated against Freeland for engaging in protected activity. *See Gogel*, 967 F.3d at 1135. Now, the final leg of this analysis reverts back to Freeland, and he must "demonstrate that the 'proffered reason was merely a pretext to mask retaliatory actions." *Id.* (quoting *Bryant*, 575 F.3d at 1308) (alteration adopted). "In other words," Freeland "must prove that had [he] not [engaged in the protected conduct], [he] would not have been fired."[15] *Gogel*, 967 F.3d at 1135 (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Repeatedly, the Eleventh Circuit Court of Appeals has emphasized that if the proffered nonretaliatory reason "is one that might motivate a reasonable employer, [the] employee must meet that reason *head on* and rebut it . . . ." *Gogel*, 967 F.3d at 1136 (citations omitted) (emphasis added). In an attempt to do so, Freeland tries to persuade the Court that NG Turf's articulated reason is not believable. [Doc. 39, pp. 16–17 (first

---

[15] "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Gogel*, 967 F.3d at 1136 (quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013)).

quoting *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) and then quoting *Howard,* 32 F.3d at 526)]. In short, Freeland points out that there is a lack of documentation within NG Turf's own employment records to support its proffered reason. [Doc. 39, pp. 17–19]. With NG Turf's inability to produce "a single document" that supports Mark's perception of how Freeland had acted in the past or what Mark learned during his investigation, Freeland would have the Court improperly second-guess Mark's employment decision. *See Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions . . . ."). The wisdom of an employer's business decisions is irrelevant "as long as those decisions were not made with [retaliatory] motive." *Alvarez*, 610 F.3d at 1265–66 (citation omitted).

Plain and simple, Mark's proffered reason for firing Freeland—his attitude, generally speaking—is a legitimate, nonretaliatory reason. "Thus, to establish pretext, at the summary judgment stage," Freeland had to demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in NG Turf's "proffered legitimate reason[] for its actions that a reasonable factfinder could find [it]

unworthy of credence."[16] *Gogel*, 967 F.3d at 1136 (citation omitted). And, "[a] reason is not pretext for retaliation unless it is shown *both* that the reason was false and that retaliation was the real reason." *Id.* (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)).

Freeland has not met NG Turf's reason head on to demonstrate that its reason is unworthy of credence. Here's why. First, Freeland never offered any evidence to show that his coworkers didn't actually believe he had a bad attitude. *See* [Doc. 28, McWhorter Decl., ¶ 19]. Second, while he may not have "curse[d] or [got] upset with [Chris]" on the morning of August 20, 2018, Freeland never offered anything to show that he hadn't curse at his coworkers "when he wasn't happy with what was going on." [*Id.*]; *see also* [Doc. 39-20, Freeland Decl., ¶ 14] *in connection with* [Doc. 30, McWhorter Depo., p. 33:912]. And, third, although he may have never been formally disciplined for it, Freeland still failed put forth any evidence to demonstrate that his coworkers didn't actually find him "difficult to work with." [Doc. 28, McWhorter Decl., ¶ 19].

Despite making no attempt to rebut NG Turf's reason head on, Freeland makes much about his belief that Mark based his ultimate decision from Chris's "false report"

---

[16] In an effort to reveal an inconsistency for NG Turf's proffered nonretaliatory reason, Freeland points to the fact that Mark indicated that he was firing Freeland due to "Reorganization" on Freeland's separation notice. [Doc. 39, pp. 18–19]; [Doc. 30, p. 261]. However, NG Turf explained that Mark "intentionally" listed reorganization as Freeland's reason for termination "so that [Freeland] could receive unemployment benefits" because Mark "cared about [Freeland] and didn't want him to be unable to feed his family." [Doc. 28, McWhorter Decl., ¶ 25]. Such an inconsistency wasn't made to mask an intent to retaliate, instead it was made in an effort to *help* Freeland.

about what happened on the morning of August 20, 2018. [Doc. 39-1, ¶ 59]; [Doc. 39, p. 16 ("In justifying his termination decision, [Mark] said that it was based, in part, on a conversation with [Chris].")]. However, it must be remembered that "[a]n employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a . . . [retaliatory] reason.'" *Gogel*, 967 F.3d at 1148 (citation omitted). At bottom, the evidence shows that Mark, although he had never himself experienced it, found Freeland's attitude on the job to be less than desirable. [Doc. 28, McWhorter Decl., ¶¶ 19, 21]. When it comes to discrimination cases, the critical element always remains the "reality as it exists in the decision maker's head when the [employment] decision [is] made." [Doc. 27-1, p. 14 (citing *Alvarez*, 610 F.3d at 1266)]; *see also* [Doc. 30, McWhorter Depo., pp. 128:10—129:14 (detailing Mark's state of mind)].

Even if Mark decided to terminate Freeland based on some mistaken belief regarding Freeland's conversation with Chris, federal anti-discrimination law does not work to permit a court's interference with that decision. *Gogel*, 967 F.3d at 1149 (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Rather, the Court's only concern "is limited to whether [NG Turf] gave an honest[, nonretaliatory] explanation" for its employment decision. *Id.* NG Turf gave that reason. And, more importantly, Mark testified that even though he found out that Freeland was going to

file a lawsuit against him, that was "[a]bsolutely not" the reason he fired Freeland. [Doc. 30, McWhorter Depo., p. 197:22–24].

The law places "the ultimate burden of persuasion" on Freeland, and there is no evidence in this record to rebut NG Turf's "repeated and insistent" proffered reason that Mark fired Freeland because of Freeland's "bad attitude." *Gogel*, 967 F.3d at 1149. [Doc. 28, McWhorter Decl., ¶¶ 19, 24]; *see also* n.15, *supra*. Without this critical evidence, Freeland cannot show that his engagement in protected activity was a motivating factor for his retaliation claim under Title VII nor can he show that he would not have been fired "but-for" his engagement in protected activity under § 1981's more stringent hurdle. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S.Ct. 1009, 1019 (2020). Accordingly, NG Turf is also entitled to summary judgment on Freeland's retaliation claims.

## CONCLUSION

For all of the above reasons, Freeland's race discrimination and retaliation claims fail, and the Court **GRANTS** Defendant NG Turf's Motion for Summary Judgment [Doc. 27]. The Court **DIRECTS** the Clerk of Court to **ENTER** Judgment accordingly and **CLOSE** this case.

**SO ORDERED**, this 15th day of December, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**